NOT DESIGNATED FOR PUBLICATION

No. 129,580

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of B.H., a Minor Child.

MEMORANDUM OPINION

Appeal from Reno District Court; DANIEL D. GILLIGAN, judge. Submitted without oral argument. Opinion filed May 1, 2026. Affirmed.

*Kaitlin M. Dixon*, of Wichita, for appellant natural father.

*Jamie L. Karasek*, assistant district attorney, and *Thomas Stanton*, district attorney, for appellee.

Before WARNER, C.J., HILL and BRUNS, JJ.

PER CURIAM: Father appeals the district court's decision to terminate his parental rights to his minor child. The district court found Father unfit under the criteria set forth in multiple statutory grounds for unfitness, that those conditions were unlikely to change in the foreseeable future, and that termination would be in the child's best interests. Based on our review of the record on appeal, we find that the district court's findings were supported by clear and convincing evidence. In addition, we find that the district court appropriately found that Father's unfitness was unlikely to change in the foreseeable future and that the termination is in the minor child's best interests. Thus, we affirm the district court's order terminating Father's parental rights to B.H.

1

*Child in Need of Care Proceedings*

On February 12, 2024, the State petitioned the district court to find B.H.—who was born only a couple of weeks before—to be a child in need of care (CINC). In the petition, the State alleged that prior to B.H.'s birth, the mother—who is not a party to this appeal—informed the Department for Children and Families (DCF) that she had used methamphetamine and requested help because she was pregnant. The petition also alleged that while the mother was in labor, she admitted to using methamphetamine in the days prior to B.H.'s birth. Moreover, the petition alleged that B.H. was transferred to a hospital in Wichita shortly after birth, that B.H. was severely underweight, and that B.H. was suffering from a bowel obstruction.

According to the CINC petition, B.H. was placed in police protective custody after being released from the hospital. As to Father, the petition alleged that he was currently in custody at the Reno County jail. The petition also alleged that Father had tested positive for methamphetamine on January 2, 2024, and, 10 days later, was found to be in violation of his probation in the Reno County case for drug and traffic offenses. Furthermore, the petition alleged that Father was scheduled to be released from jail on February 29, 2024, to participate in an inpatient substance abuse treatment program.

On February 14, 2024, the district court issued temporary orders in the CINC action and placed B.H. in out-of-home placement in the custody of the Secretary of DCF. The district court ordered both parents to complete psychological evaluations and ordered Father to submit to paternity testing. In addition, a referral was made to St. Francis Ministries to begin developing a reintegration plan as to the mother. Subsequently, after paternity was established, Father was incorporated into the plan.

On March 25, 2024, Father tested positive for methamphetamine use. A few weeks later, he was discharged from inpatient drug treatment prior to completing the program. He also failed to report to his probation officer as directed and admitted to using methamphetamine. As a result, Father was arrested for probation violations and for failure to appear in district court.

On May 3, 2024, Father stipulated to violating the terms of his probation, and his probation was revoked, reinstated, and continued for 12 months. The next day, Father's paternity was established based on genetic testing. A few days later, Father tested positive for methamphetamine and was ordered to serve a 3-day jail sanction. At a pretrial hearing for the CINC case held on May 9, 2024, the district court ordered Father to complete hair follicle testing, complete a psychological evaluation, and complete a urinalysis test following the hearing.

On May 21, 2024, Father was arrested for possession of illegal substances, possession of drug paraphernalia, and other traffic-related offenses after he was stopped by law enforcement. The next day, St. Francis Ministries met with Father while he was in jail. Although Father was released from jail on May 28, 2024, he was arrested once again less than a month later for violating his probation. On June 27, 2024, St. Francis Ministries again met with Father while he was in jail. Even though Father was released from jail the following day, he admitted to using methamphetamine and was arrested for probation violations on July 3, 2024. While in jail, St. Francis Ministries again met with Father.

On July 24, 2024, the district court conducted a combined adjudication and disposition hearing in the CINC action at which Father did not appear. At the hearing, the district court found B.H. to be in need of care. Consequently, it ordered that B.H. remain in DCF custody with continued out-of-home placement. The district court also ordered a plan to integrate B.H. into Father's home that included six tasks: (1) complete a

psychological evaluation and follow its recommendations; (2) complete a mental health intake—being honest about his relationships and drug use—and follow its recommendations; (3) complete a drug and alcohol assessment; (4) complete frequent and random drug testing; (5) maintain safe and stable housing and provide documentation to verify compliance; and (6) maintain stable employment sufficient to meet B.H.'s needs and provide documentation to verify compliance.

On August 9, 2024, Father was again found to have violated the terms of his probation and was ordered to serve a 60-day jail sanction. Additionally, Father's probation was reinstated for a period of 18 months with the condition that he follow recommendations for drug treatment. Ten days later, a permanency planning conference was held, but Father did not participate because he was in jail. So, St. Francis Ministries met with Father in jail on August 29, 2024, and on September 4, 2024.

In September 2024, Father yet again tested positive for methamphetamine. The following month, St. Francis Ministries met with Father on October 16, 2024. Two days later, Father admitted to using K2, which is a synthetic cannabinoid. St. Francis Ministries once again met with Father on November 21, 2024. In early December 2024, Father once again tested positive for methamphetamine. A few days later, he failed to show up for a hair follicle drug screen requested by St. Francis Ministries.

Father admitted to using methamphetamine on December 10, 2024. He then served a 3-day jail sanction for probation violations. At the end of December 2024, Father admitted to using THC and tested positive for using methamphetamine as well as fentanyl. He was arrested yet again on January 7, 2025, and tested positive for methamphetamine and cocaine the following day. Although St. Francis Ministries met with Father on January 16, 2025, he subsequently failed to show up for his appointments for medication and case management. He also admitted to using methamphetamine on January 25, 2025.

The agency held a third case planning conference in B.H.'s case on February 5, 2025, after which the case plan was submitted to the district court. However, Father failed to participate in the conference. St. Francis Ministries reported that there was lack of progress on completion of Father's case plan tasks and that he continued to test positive for drug use. St. Francis Ministries further reported that Father had not completed a psychological evaluation, failed to provide documentation regarding his housing situation, failed to maintain employment, and failed to sign releases to allow it to verify his progress on the case plan tasks.

On February 10, 2025, Father was instructed to report by the end of the day for a drug screen, and Father failed to report back. Although Father reported for testing the following day, he attempted to alter his drug screen results by using a device. He later admitted that he used both methamphetamine and THC. Father was then arrested for probation violations due to his continued drug use, his attempt to alter his drug screen results by using a device, and his failure to report to his probation officer. On February 27, 2025, Father tested positive for methamphetamine. Two weeks later, the district court revoked Father's probation and ordered him to serve his underlying 30-month prison sentence arising out of his Reno County convictions for possession of methamphetamine, possession of drug paraphernalia, and driving while suspended.

*Termination of Parental Rights Proceedings*

On March 17, 2025, the State moved to terminate Father's parental rights to B.H. as well as those of the mother. In doing so, the State alleged that Father was presumptively unfit under K.S.A. 38-2271(a)(5) and further unfit under the following statutory factors:

1. Emotional illness, mental illness, mental deficiency, or physical disability of the parent of such duration or nature as to render the parent unable to care for

5

the ongoing physical, mental, and emotional needs of the child. K.S.A. 38-2269(b)(1).

2. Use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental, or emotional needs of the child. K.S.A. 38-2269(b)(3).

3. Felony conviction or imprisonment rendering the parent unfit to care for the child. K.S.A. 38-2269(b)(5).

4. Failure by appropriate public or private agencies to rehabilitate the family despite making reasonable efforts. K.S.A. 38-2269(b)(7).

5. Lack of effort on the part of the parent to adjust the circumstances, conduct, or conditions necessary to meet the needs of the child. K.S.A. 38-2269(b)(8).

6. Failure to maintain regular visitation, contact, or communication with the child. K.S.A. 38-2269(c)(2).

7. Failure to carry out a reasonable rehabilitation plan approved by the district court directed toward the integration of the child into a parental home. K.S.A. 38-2269(c)(3).

On June 2, 2025, the district court held a hearing on the petition for the termination of Father's parental rights as to B.H. Father appeared in person and in custody. The mother failed to appear at the termination hearing, and the district court terminated her parental rights based on evidence proffered by the State. We note that mother did not appeal the district court's decision.

As to Father's parental rights, the State presented testimony from the St. Francis Ministries case manager, the St. Francis family support worker, Father's probation officer, and two of the law enforcement officers involved in Father's arrest in May 2024 for possession of illegal substances, possession of drug paraphernalia, and other traffic-related offenses. The State also introduced 33 exhibits that were admitted into evidence. These exhibits included case plans, documents relating to the attempts made to work with

the family, and records from Father's criminal cases. Father testified on his own behalf and called his current wife—who is not B.H.'s mother—and his stepdaughter as witnesses.

Sergeant Ian McIntyre of the Hutchinson Police Department testified he encountered Father during a traffic stop on May 21, 2024. During the stop, Father stated he was on his way to supervised visitation with B.H. at St. Francis Ministries. According to Sergeant McIntyre, another officer found a used syringe needle in Father's pants pocket, which contained a small amount of clear substance. Based on his training and experience, the officer believed the syringe contained illegal drugs. As a result, Sergeant McIntyre placed Father under arrest. During a subsequent search of Father's vehicle, several items consistent with drug paraphernalia were found.

Similarly, Officer Kyle Danahy testified that he also responded to the traffic stop on May 21, 2024. Officer Danahy testified that he was the one who searched Father and found the syringe in his pants pocket. Based on his training and experience, the officer believed the substance in the syringe was consistent with methamphetamine.

Catina Kelly—who is a case manager employed by St. Francis Ministries—testified that she was assigned B.H.'s case on February 14, 2024. She testified that Father was added to B.H.'s case plan a few months later. Kelly explained that a case plan consists of a list of tasks to be performed by the parents—sometimes including specific court orders—that are to be completed before integration can occur.

According to Kelly, Father was incarcerated—related to drug offenses—at various points while she was working on B.H.'s case. She also testified that there were significant concerns regarding Father's drug use as well as his mental health. As a result, Father had been ordered by the district court to complete a psychological evaluation. Kelly explained that St. Francis Ministries not only had concerns regarding Father's substance abuse and

7

mental health but also about his overall stability as well as his ability to provide financially for B.H. To address these issues, the case plan required Father to complete several tasks as discussed above. Kelly testified that she was not aware of any progress Father had made toward completing those tasks.

Kelly testified that she prepared a written report for a review conducted by the district court on February 6, 2025. In the report, Kelly explained why she believed integration into Father's home was no longer viable. Specifically, she testified that there was no verification of Father's housing or income, no evidence of completion of a mental health evaluation or a drug and alcohol assessment, and Father continued to test positive for drugs. Kelly also noted that at the time of the termination hearing, Father was serving a prison sentence. Kelly explained that under these circumstances, it was her opinion that it was not safe to integrate B.H. into Father's care.

Further, Kelly testified that even if Father was released from prison, she would not recommend integration into Father's home based on his history of drug use and instability. She explained that when Father was released from custody, he would have to start at step one of the case plan. As a result, there would be an additional delay in permanency for B.H., who had been in out-of-home placement since he was approximately two weeks old. Kelly also pointed out that B.H. was 16 months old at the time of the termination hearing and that Father had only participated in nine supervised visits with the child despite having approximately 27 opportunities to do so.

Kelly testified that Father had failed to build a solid parent-child bond with B.H. and had made no measurable progress on completing the tasks in the case plan. Kelly explained that it is essential for a parent to have a relationship with a child to form a meaningful bond, and Father had not had sufficient contact with B.H. to form such a bond with him. In addition, Kelly testified that St. Francis Ministries did not have

8

additional services that would make integration into Father's home more viable. Finally, she confirmed that it was still her opinion that B.H.'s integration into Father's home was no longer a viable option.

Madison Starks—a St. Francis Ministries family support worker who supervised visits between B.H. and Father—testified that it was Father's wife who did most of the caretaking during visits. According to Starks, Father would often be on his phone during the supervised visits and failed to demonstrate parenting skills. She testified that Father would generally say hello to B.H., hold him for a few minutes, and then his wife would interact with the child for the rest of the visit. Because Father had visited with B.H. less than 10 times, Starks recognized that it was difficult to fully assess Father's parenting skills. However, Starks testified that Father had failed to reach out to her to maintain contact with B.H. while he was incarcerated. Based on her observations, Starks was of the opinion that integration of B.H. into Father's home was not possible at the present time.

Joe Palacioz—Father's probation officer—testified that he had been supervising Father since October 13, 2023. Palacioz testified that although Father had gone to inpatient drug treatment programs several times, he had failed to successfully complete treatment. Palacioz also testified that Father repeatedly used methamphetamine and tested positive for drugs on several occasions while on probation. Despite receiving assistance to address his substance abuse and mental health issues, Father continued to display a cycle of continued methamphetamine use. Moreover, Palacioz testified that by the time Father was ordered to serve his underlying prison sentence, community corrections had exhausted its available services to try to rehabilitate him.

In his defense, Father testified that his substance abuse was a disease that prevented him from being actively involved in B.H.'s life. Nevertheless, Father explained that he was getting help with his drug problem and taking parenting classes in prison.

According to Father, he was on a new medication that was "pretty good" in helping him with his sobriety. He also indicated that he was attending AA and NA meetings in prison. Father further testified that he had completed a drug treatment program in late 2024, and that he had documentation of his completion at his home.

Father indicated that he anticipated being released from prison in November 2025. He testified that after he was released, he would continue drug treatment in order to maintain his sobriety and to provide a stable home for B.H. Father stated that he and his current wife had a good home that is "just waiting for [B.H.] to come home." Father testified that he has grandchildren and has a strong bond with them. So, he believed that B.H. would fit into his home environment.

In addition, Father testified that he had been on his cell phone during his supervised visits with B.H. so that he could take photos and videos. He also claimed that he was involved in caretaking duties of B.H. during the supervised visits. Father also asserted that he did not use drugs in his home and claimed to have a support system in place to keep him from using drugs again. On cross-examination, Father admitted that he did not provide support to B.H.'s mother during her pregnancy other than providing her some food.

Father's wife testified she believes Father loves B.H. and that the two simply needed more time to bond. Although she indicated that B.H. had some interaction with Father at the supervised visits, she admitted that B.H. would mostly interact with her. She testified that Father "has done an amazing job with my kids," and she believed he could handle the stress of parenthood upon his release from prison. Father's wife candidly admitted that he had continued to use drugs despite receiving drug and mental health treatment while he was on probation. Lastly, she stated that she was willing to take care of B.H. until Father was released from prison.

The final witness was Father's adult stepdaughter. She testified that she had been present at one of the supervised visits and believed that it went well. She testified that Father had grandchildren who adored him and are closely bonded with him. Additionally, the stepdaughter testified that she had never seen Father use drugs or appear to be under the influence around either her or her child. In her opinion, Father has the ability to remain sober.

At the close of the evidence, the district court heard closing argument presented by counsel as well as by B.H.'s guardian ad litem. The State and the guardian ad litem both agreed that Father's parental rights as to B.H. should be terminated. On the other hand, Father's attorney argued that he should be given another opportunity at having B.H. integrate into her client's home. After the closing arguments were completed, the district court summarized the history of the case and the evidence in detail.

*The District Court's Ruling*

Ultimately, the district court found on the record that the State had presented clear and convincing evidence that Father was unfit to parent B.H. The district court also found that Father's unfitness was unlikely to change in the foreseeable future. In particular, the district court found—looking at "the foreseeable future through the eyes of a child"—that B.H. had already been without Father for around 70 percent of his life and this number would increase to 80 percent by the time Father was released from prison. Finally, the district court found that it is in B.H.'s best interests to terminate Father's parental rights because of the length of time spent without Father acting as a caregiver, the interruption to B.H.'s stability if taken away from known caregivers, and the risk involved in giving Father another chance based on his prior history.

On June 12, 2025, the district court filed a written order with the clerk of the court terminating Father's parental rights as to B.H. In the order, the district court found that

11

the evidence was clear and convincing that Father "is unfit by reason of conduct or condition which renders [him] unable to care properly for [B.H.] and the conduct or condition is unlikely to change in the foreseeable future." Specifically, the district court found that Father was unfit to parent B.H. based on K.S.A. 38-2269(b)(3) ("use of intoxicating liquors or narcotic or dangerous drugs"), K.S.A. 38-2269(b)(5) ("conviction of a felony and imprisonment"), K.S.A. 38-2269(b)(8) ("lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child"), K.S.A. 38-2269(c)(2) ("[f]ailure to maintain regular visitation, contact or communication with the child or with the custodian of the child"), and K.S.A. 38-2269(c)(3) ("[f]ailure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home"). Significantly, the district court did not rely upon the presumption set forth in K.S.A. 38-2271(a)(5) (based on out-of-home placement for over one year with failure to carry out reasonable plan for reintegration), nor did it rely upon K.S.A. 38-2269(b)(1) ("[e]motional illness, mental illness, mental deficiency or physical disability of the parent") in its termination order.

In its written order, the district court also found that "[c]onsidering the physical, mental or emotional health of the child, termination of parental rights is in the best interests of [B.H] and the physical, mental or emotional needs of the child would best be served by termination of parental rights." As a result of these findings, the district court terminated Father's parental rights and placed B.H. in the custody of DCF for adoption proceedings. Thereafter, Father filed a timely notice of appeal.

ANALYSIS

On appeal, Father contends that the district court erred in terminating his parental rights to B.H. In response, the State contends there is sufficient evidence in the record to support the district court's findings and conclusions. Based on our review of the record on appeal, we find that the State introduced clear and convincing evidence to support the

12

district court's conclusion that Father is unfit to parent B.H. and that this unfitness is unlikely to change in the foreseeable future. Furthermore, we find that the termination of Father's parental rights is in B.H.'s best interests.

*Standard of Review*

Because a parent has a fundamental liberty interest under the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of the parent's child, the parent is entitled to due process of law before a parent can be deprived of the right to the custody, care, and control of the child. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 599 (1982); *In re P.R.,* 312 Kan. 767, 778, 480 P.3d 778 (2021). A parent's interest in the care, custody, and control of their children has been recognized by the United States Supreme Court as "perhaps the oldest of the fundamental liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65-66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). But this fundamental right to parent is not without limits. *In re P.R.,* 312 Kan. at 778. Because child welfare is a matter of public concern, the State may assert its interest "through state processes designed to protect children in need of care." *In re A.A.-F.*, 310 Kan. 125, 146, 444 P.3d 938 (2019).

The Revised Kansas Code for Care of Children, K.S.A. 38-2201 et seq., provides that the district court may terminate parental rights only if it makes three findings: (1) the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child; (2) the conduct or condition that makes the parent unfit is unlikely to change in the foreseeable future; and, (3) terminating the parental rights is in the best interests of the child. K.S.A. 38-2269(a), (g)(1); see *In re E.L.*, 61 Kan. App. 2d 311, 322, 502 P.3d 1049 (2021). Because a parent has a fundamental liberty interest in the relationship with his or her child, the district court must make the fitness findings based on clear and convincing evidence. K.S.A. 38-2269(a); 61 Kan. App. 2d at 322.

In our review of a termination of parental rights case, we must determine whether clear and convincing evidence supports the district court's findings "that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child." K.S.A. 38-2269(a). In addition, we must find clear and convincing evidence for the district court's findings that "the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a). In doing so, we must determine whether the evidence—viewed in the light most favorable to the State as the prevailing party—could have convinced a rational factfinder that these facts were highly probable. In making this determination, we are not to weigh conflicting evidence, pass on the credibility of witnesses, or redetermine factual questions. *In re K.W.D.*, 321 Kan. 100, 110, 573 P.3d 221 (2025). Moreover, any single factor under K.S.A. 38-2269, standing alone, may establish grounds for termination of parental rights. K.S.A. 38-2269(f).

We review a district court's findings regarding whether termination is in the child's best interests for an abuse of discretion. 321 Kan. at 116. Under K.S.A. 38-2269(g)(1), after the determination of unfitness and foreseeability has been made, the focus becomes whether the termination is in the child's best interests based on his or her needs. *In re R.S.*, 50 Kan. App. 2d 1105, 1113-15, 336 P.3d 903 (2014). If a district court makes additional factual findings that relate solely to the best-interests determination, those findings are to be based on a preponderance of the evidence. *In re E.L.*, 61 Kan. App. 2d at 330. So far as our review involves the interpretation of statutes, it is unlimited. *In re D.H.*, 57 Kan. App. 2d 421, 430, 453 P.3d 870 (2019).

*Findings of Parental Unfitness*

K.S.A. 38-2269(b) provides a list of nonexclusive factors a district court is to consider in determining whether a parent is unfit. The district court must also consider a separate list of nonexclusive factors when—as in this case—a child is not in the parent's physical custody. See K.S.A. 38-2269(c). Any one of the factors set forth in K.S.A. 38-

14

2269(b) or (c) may—but does not necessarily—establish grounds for termination of parental rights. K.S.A. 38-2269(f).

Here, the district court found Father unfit under three factors listed in K.S.A. 38-2269(b) and two factors under K.S.A. 38-2269(c). At the outset, Father argues that the district court failed to make explicit findings that he was unfit by clear and convincing evidence as Kansas law requires. However, in reviewing the record, we find that the district court went through the factors it relied upon and made findings as to each in its bench ruling. Then, the district court filed a written termination order journalizing its findings and conclusions in which it set forth each of those factors that it relied on in making its decision. In its written order, the district court explicitly found that "[t]he evidence is clear and convincing that . . . [Father] is unfit by reason of conduct or condition which renders [him] unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future."

The district court expressly found in its written termination order—based on clear and convincing evidence—that Father was unfit to parent B.H. and that his unfitness was unlikely to change in the foreseeable future. Father made no objection to the district court's written findings. When a party does not object to the district court's findings, we presume that the district court made all findings necessary to support its decision. *In re Marriage of Knoll*, 52 Kan. App. 2d 930, 941, 381 P.3d 490 (2016); see *In re D.M.*, No. 125,894, 2023 WL 4145324, at *11 (Kan. App. 2023) (unpublished opinion). Consequently, we find the district court's findings to be sufficient, and we will turn to the question of whether there is clear and convincing evidence in the record to support the factors upon which the district court relied in terminating Father's parental rights to B.H.

*K.S.A. 38-2269(b)(3)*

The district court found Father unfit based on the "the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child." K.S.A. 38-2269(b)(3). Notably, the State presented extensive evidence that Father has used methamphetamine and other illegal substances on an ongoing basis—both before and after B.H.'s birth.

Father argues that although he openly acknowledged his history of substance abuse, he points to evidence that he had achieved sobriety while in custody. Further, he claims that his recovery is now supported by effective treatment and medical intervention. But the State presented considerable evidence that Father had addiction issues, and his drug use continued throughout B.H.'s case. The State introduced testimonial evidence with supporting exhibits detailing Father's history of violating the terms of his probation and his continued drug use which led to the revocation of his probation and his incarceration. Instead of maintaining sobriety, we note that Father attempted to alter a drug screen test, and he admitted to the ongoing use of illegal drugs on numerous occasions. The State also introduced evidence that Father had failed to provide any verification showing that he had completed drug treatment.

Relying on the evidence presented, the district court found that Father suffered from addiction and had never achieved meaningful sobriety during the pendency of the case. To show a parent's unfitness due to the use of intoxicating liquors or narcotics, "[t]he State is not required to provide direct evidence that a parent's conduct is due to drug use if sufficient evidence shows that drug use impeded reintegration." *In re M.S.*, 56 Kan. App. 2d 1247, 1258, 447 P.3d 994 (2019). The district court was reasonably concerned that Father—who had failed to show any measurable time of sobriety when he was not in prison—would be unable to maintain sobriety upon his release from prison.

16

Hence, we find that the district court's conclusion that Father is unfit under K.S.A. 38-2269(b)(3) is supported by clear and convincing evidence.

*K.S.A. 38-2269(b)(5)*

The district court found Father unfit based on "conviction of a felony and imprisonment." K.S.A. 38-2269(b)(5). We acknowledge that Father does not dispute that he had a felony conviction and was incarcerated. Instead, he merely claims that his incarceration was temporary, and he blames the agency for failing to do enough to arrange visits to allow him to establish a meaningful bond with B.H.

The State presented evidence that due to Father's incarceration, he was unable to provide support to B.H., including parental care, bonding, help with decision-making, emotional support, and provisions for B.H.'s needs, which are among the core elements of parenthood.

Relying on the evidence presented, the district court found clear and convincing evidence that Father was unable to properly care for B.H. And even though Father had a plan to maintain sobriety and provide care for B.H. upon his release from prison, this would require extensive additional time after his release to complete all the case plan tasks assigned and be prepared for integration of B.H. into his home. See *In re K.W.D.*, 321 Kan. at 113 (a forward-looking assessment of whether a parent will be able to care for a child in the near term includes not only a projected release date, but also time and resources for the parent to "secure housing, employment, treatment, and rebuild the parent-child relationship.")

Father testified that he had not yet established a strong parent-child relationship with B.H. because he had not been given enough time with B.H. Father asked the district court for additional time with B.H. But given Father's continued incarceration at the time

17

of the termination hearing with a release date still months down the road, we find that the district court's conclusion that Father is unfit under K.S.A. 38-2269(b)(5) is supported by clear and convincing evidence.

*K.S.A. 38-2269(b)(8)*

The district court found Father unfit based on the "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." K.S.A. 38-2269(b)(8). The evidence showed Father failed to complete his case plan tasks, including those associated with achieving sobriety, which was the most concerning issue for the court.

Father argues he adjusted his circumstances by demonstrating "substantial compliance and meaningful adjustments," by making "tangible, verifiable progress while incarcerated," and by addressing his mental health needs and substance abuse issues. Father also argues he had a stable plan to put in place after his release from prison and had the full support of his wife and family.

Although Father had a plan, the State presented evidence that he failed to maintain sobriety and comply with the terms of probation even after B.H.'s birth and placement in DCF custody. This alone shows that he failed to adjust his conduct or conditions to demonstrate an ability to care for his child. Father made no meaningful progress maintaining sobriety or providing for B.H.'s needs during the history of the case. As previously discussed, although Father has a plan and has expressed his desire to provide a safe home for B.H. after his release from prison, he has not demonstrated any meaningful progress on his case plan tasks to work toward integration of B.H. into his home.

We find the record is replete with evidence that even after B.H.'s birth, Father showed a lack of effort to adjust his circumstances, conduct or conditions to meet the

18

child's needs. Father continued to test positive for drugs, and he failed to successfully complete substance abuse treatment to address his addiction. Thus, based on our standard of review, we find clear and convincing evidence that Father was unfit under K.S.A. 38-2269(b)(8).

*K.S.A. 38-2269(c)(2)*

The district court found Father unfit based on the "failure to maintain regular visitation, contact or communication with the child." K.S.A. 38-2269(c)(2). Father argues that his failure to maintain regular visitation, contact, or communication was the agency's failure rather than a result of "parental neglect or disinterest." He points to the agency's failure to bring B.H. to the prison for visits to promote the parent-child bond.

Father's argument ignores his own failures which led to his incarceration. And again, the State presented testimony that Father was offered 27 visits with B.H., but he attended only 9 of those visits. The one-hour supervised visits never progressed to longer visits or unsupervised visits. The caseworker testified that during visits, Father was often on his phone and allowed his wife to do most of the caretaking for B.H. In finding clear and convincing evidence to support this factor, the district court pointed to Father's repeated incarcerations that resulted from his failure to maintain his sobriety.

Our review of the record confirms that Father failed to maintain regular visitation, contact, or communication. Although part of that was due to Father's incarceration, his inability to remain sober and out of jail or prison led to the disruption of contact and communication with B.H. As such, considering the evidence in the light most favorable to the State, we find clear and convincing evidence in the record to show that Father was unfit under K.S.A. 38-2269(c)(2).

*K.S.A. 38-2269(c)(3)*

The district court found Father unfit based on the "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home." K.S.A. 38-2269(c)(3). The evidence showed Father failed to complete his case plan tasks, including those associated with drug use and his goal of achieving sobriety.

Father argues that he carried out several components of his case plan by maintaining stable housing, paying utilities, keeping the home clean, ensuring the home was approved by the case worker, requesting visits with B.H. while he was in prison, and making progress toward drug treatment and stability while in prison. However, as noted by the district court, Father failed to provide verification of much of his claimed progress.

In particular, we find the record contains clear and convincing evidence that Father failed to complete a psychological evaluation and follow its recommendations; complete a mental health intake—being honest about his relationships and drug use—and follow its recommendations; provide verification of a drug and alcohol assessment; consistently complete frequent and random drug testing; provide documentation of safe and stable housing; and maintain stable employment sufficient to meet B.H.'s needs. So, our review of the record confirms that the district court's findings that Father has failed to complete virtually any of his case plan tasks of the integration plan are supported by clear and convincing evidence. As such, we find clear and convincing evidence that Father was unfit under K.S.A. 38-2269(c)(3).

*Unfitness for the Foreseeable Future*

Next, Father contends that the district court erred in concluding that his unfitness was unlikely to change in the foreseeable future based on his anticipated release from prison. Once a district court finds a parent unfit, it must also find that the State proved by

clear and convincing evidence that the conduct or condition rendering the parent unfit is unlikely to change in the foreseeable future. K.S.A. 38-2269(a). As with an unfitness finding, a district court's foreseeability finding must be supported by clear and convincing evidence. In reviewing the district court's foreseeability findings, we do not reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re K.W.D.*, 321 Kan. at 110.

Although Father argues that he will soon be released and is working toward completion of the tasks on his case plan, he has demonstrated no progress toward sobriety outside of incarceration. The State presented testimony that he would have to maintain his sobriety for a substantial amount of time after his release and work toward establishing a bond with B.H. So, Father would be unable to prove his fitness to care for B.H. for quite some time after his anticipated release date, which was still months after the termination hearing. In assessing whether a parent's unfitness is unlikely to change in the foreseeable future, "the district court may look to a parent's past conduct as an indication of future conduct." *In re E.L.*, 61 Kan. App. 2d at 328.

In deciding whether a parent will remain unfit for the foreseeable future, a district court may consider patterns of behavior, attributing past conduct to future behavior, and can "give weight to actions over intentions." *In re D.G.*, 319 Kan. 446, 459, 555 P.3d 719 (2024). In addition, the foreseeable future should be considered from the child's perspective because children understand time differently and deserve "'permanency within a time frame reasonable to them.' *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014)." *In re D.G.*, 319 Kan. at 459. And "a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008).

B.H. was placed in custody when he was approximately 2 weeks old and remained in custody until the time of the hearing, which was about 16 months. Even after B.H.'s

birth, Father failed to make any progress toward maintaining sobriety and completing his case plan tasks. Father now asks us to believe that he will be released from prison and be able to maintain sobriety and stability for B.H. despite his lack of any measurable progress during the history of the case. Father's pattern of behavior works against his argument that his condition of unfitness is likely to change in the foreseeable future. Father has expressed an intention to change, but he has not demonstrated any significant progress.

Our review of the record confirms the district court's findings that Father was unable to make measurable progress toward becoming a fit parent during the pendency of the case. His past conduct is relevant to the district court's finding that he was unlikely to change his circumstances in the foreseeable future. Viewing the evidence in a light most favorable to the State, we find clear and convincing evidence to support the district court's findings that Father's unfitness was unlikely to change in the foreseeable future.

*Best Interests of the Child*

Finally, Father challenges the district court's finding that termination was in the best interests of the child. Specifically, Father points to his hope of being released from prison and providing a safe environment for B.H.

Once the district court finds that a parent is unfit and unlikely to change in the foreseeable future, it must determine whether termination of parental rights is in the best interests of the child involved by a preponderance of the evidence. K.S.A. 38-2269(g)(1); see *In re R.S.*, 50 Kan. App. 2d at 1116. The statute provides that in making that determination, the court shall give primary consideration to the physical, mental, or emotional health of the child. K.S.A. 38-2269(g)(1).

We first note that a district court's best interests finding must be supported by a preponderance of the evidence, meaning facts that are "more probably true than not." *State v. Gatewood*, 321 Kan. 564, 569, 582 P.3d 534 (2026); *In re T.H.*, 60 Kan. App. 2d 536, 546-47, 494 P.3d 851 (2021); but see also *In re K.W.D.*, 321 Kan. at 116 (noting that the Supreme Court recently stated that it had not officially adopted the "lower" preponderance of the evidence standard but also had not decided that issue because the State had provided clear and convincing evidence).

Once we have determined that the evidence in the record was more probably true than not, or clear and convincing, we then review a district court's decision that termination of parental rights was in the child's best interests for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d at 1114-15. A district court abuses its discretion if its decision is arbitrary, fanciful, or unreasonable or is based on an error of law or fact. *In re T.H.*, 60 Kan. App. 2d at 555-56. Here, Father—as the party asserting the district court abused its discretion—bears the burden of showing such abuse. *In re P.J.*, 56 Kan. App. 2d 461, 466, 430 P.3d 988 (2018).

First, we note that there is a preponderance of the evidence—and even clear and convincing evidence—in the record to support the district court's findings that termination was in the child's best interests. In addition, we find that Father has failed to establish the district court abused its discretion. The district court was in the best position to determine the best interests of the child. Moreover, Father has failed to demonstrate that the district court based its decision on an error of law or fact or that its decision was so unreasonable that no one would agree with it.

Given the history of the case and the amount of time that B.H. had been in custody from the perspective of the child's time, allowing the Father additional time to make meaningful progress on his case plan tasks was not in B.H.'s best interests. The evidence suggested Father's substance abuse remained an issue, and he had made no meaningful

23

progress toward his case plan goals. We agree with the district court that "[c]onsidering the physical, mental or emotional health of the child, termination of parental rights is in the best interests of [B.H] and the physical, mental or emotional needs of the child would best be served by termination of parental rights." Thus, we conclude that the State presented sufficient evidence supporting termination and the best interests finding. Further, Father failed to meet his burden to show an abuse of discretion. Accordingly, the district court did not err in terminating Father's parental rights.

CONCLUSION

In summary, clear and convincing evidence of even one factor is enough to justify a finding of parental unfitness. K.S.A. 38-2269(f). Based on our review of the record of appeal in the present case, we find clear and convincing evidence to support the district court's conclusion that Father is unfit to parent B.H., and to support its conclusion that the conduct or condition rendering his unfitness is unlikely to change in the foreseeable future. In addition, we find that the district court acted within its discretion in concluding that termination of Father's parental rights is in B.H.'s best interests. We, therefore, affirm the district court's order terminating Father's parental rights.

Affirmed.